# IN THE COURT OF APPEALS OF IOWA

No. 22-1591
Filed July 13, 2023

IN RE THE MARRIAGE OF LAURA ANN SHERWOOD
AND ROBERT DONALD SHERWOOD

Upon the Petition of
LAURA ANN SHERWOOD,
        Petitioner-Appellee,

And Concerning
ROBERT DONALD SHERWOOD,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Dallas County, Michael Jacobsen,

Judge.

        Robert Sherwood appeals a temporary support order issued by the district

court. **AFFIRMED AND REMANDED.**

        Sarah K. Franklin and Tyler L. Coe of Dentons Davis Brown PC, Des

Moines, for appellant.

        Jessica A. Millage and Andrea M. Flanagan of Flanagan Law Group, PLLC,

Des Moines, for appellee.

        Considered by Tabor, P.J., and Schumacher and Ahlers, JJ.

**TABOR, Presiding Judge.**

Robert Sherwood appeals the district court's order requiring him to pay temporary spousal support to Laura Sherwood during their marriage dissolution proceeding.[1]  He argues the district court failed to do equity in awarding Laura $1000 per month.  Laura asserts the amount of support was equitable and requests appellate attorney fees.  On de novo our review, we find the temporary order equitable.  We also grant Laura's request for fees and remand for the district court to determine a reasonable amount.

## I.  Facts and Prior Proceedings

Robert and Laura married on New Year's Day 2017 in Las Vegas.  Robert was about to turn fifty.  Laura was five years younger.  Both signed a prenuptial agreement (prenup).  That agreement listed each person's premarital property and governed the distribution of the couple's assets upon separation.  According to the prenup, Robert and Laura agreed to keep their separate incomes and property "free and clear of any claim of the other" and divide all jointly acquired property evenly if they separated.  On top of that, the two agreed that each would be responsible for their own debts and insurance.

At the time of their marriage, the two were joint owners of a Clive restaurant—Sarpino's Pizza.  Robert's interest was 80% and Laura's 20%.  But according to her affidavit, Laura considered Robert to be her boss.  Meanwhile, Robert had several income sources beyond his Sarpino's ownership.  For

---

[1] Temporary orders for financial assistance are final judgments appealable as a matter of right.  *In re Marriage of Denly*, 590 N.W.2d 48, 50 (Iowa 1999).

example, he was chief financial officer for another business—Hydro-Klean, he flipped houses, and he collected rent from two condos in Florida.

Five years after their wedding, Laura petitioned for dissolution. A few days before filing that petition, she withdrew $44,414 from the restaurant's business account and $8731 from the couple's joint bank account—for total withdrawals of $53,145. She also obtained a protective order against Robert by consent agreement. This agreement gave her temporary exclusive possession of the Florida condos to live in and to collect rent.

In response, Robert fired Laura from Sarpino's and claimed she had "forfeited" her stake in the business. And he removed her from his health insurance and tried to cancel her automobile insurance. He also stopped making her car payments—which had come from the restaurant account. The parties dispute whether he continued to make mortgage payments and cover homeowners association (HOA) fees on the Florida condo where Laura was living.

The court ordered each party to preserve assets. Laura sought a hearing on temporary matters to "determine temporary spousal support, payment of certain household bills, payment and maintenance of marital debts and obligations, and temporary attorney fees" while dissolution proceedings were ongoing. Both parties then submitted financial status affidavits detailing their assets, sources of income, and monthly expenses.

According to those affidavits, Robert's gross annual income was at least $195,000 and he had $19,340 in monthly expenses. He did not list the net value of Sarpino's. But Laura's financial status affidavit estimated the restaurant's net value at $740,000 after encumbrances. Meanwhile, Laura's yearly salary had

been $50,000. But after filing for divorce, she was collecting a gross monthly income of $6301—$2301 from unemployment and $4000 from renting the Florida condo. Her monthly expenses were $6280.82.[2] These expenses included $1950.82 for the Florida condo's mortgage and HOA fees, $1400 for transportation expenses, and $400 in medical and dental fees.

Laura asked the district court to order Robert to keep making payments on her car and to pay the mortgage and HOA fees on the Florida condos. She also requested that he provide her automobile and health insurance. And she asked for $2000 a month in temporary spousal support, $25,000 in attorney fees, and reimbursement for her costs in moving to Florida.[3] Robert resisted, asserting the court should deny temporary support, reimburse him $2000 in attorney fees, and "ask her to repay funds" taken from the restaurant account and their joint account.

The district court largely followed Laura's temporary requests on mortgage and insurance payments. The court also awarded her $1000 a month in temporary spousal support to "transition from her lost employment at Sarpino's to new employment." Robert now appeals the temporary spousal support award.

---

[2] Laura filed an amended financial status affidavit. But this was after the temporary-matters hearing. Robert asserts that this new affidavit was "after the record was closed on temporary matters" and there was no "motion or order to re-open the record." Laura does not contest this.

[3] Laura also requested Robert reimburse her for "expenses related to my safety and security." According to her affidavit, she bought a new cellphone and plan, a new wireless internet router, and a new laptop to end Robert's access to her devices. She also had to stay in a hotel before the court issued the protective order and had to obtain new locks for the Florida condo and a new security system. The district court found Laura spent $4217.54 in security measures and $9924.65 in moving expenses.

## II. Analysis

### A. Equity

We review spousal support awards de novo. *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). This means "[w]e examine the entire record and determine anew the issues properly presented." *In re Marriage of Edwards*, No. 19-1786, 2020 WL 3564698, at *2 (Iowa Ct. App. July 1, 2020). Despite this standard, we allow the district court considerable latitude in awarding support. *Pazhoor*, 971 N.W.2d at 537. Because the district court is in a better position to balance the parties' needs, "we should intervene on appeal only when there is a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015).

In measuring equity, we do not operate under spousal-support guidelines. Instead, we weigh the unique circumstances of each case. *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). And we do that weighing within statutory criteria. For temporary spousal support, those criteria include "the age of the applicant, the physical and pecuniary condition of the parties, and other matters as are pertinent, which may be shown by affidavits, as the court may direct." Iowa Code § 598.11(1) (2022). Recognizing that the record is limited in these interim matters, our supreme court has expressed a preference "to provide temporary support pending the outcome of the case" so that parties can "be adequately provided for while awaiting a final decision." *Bork v. Richardson*, 289 N.W.2d 622, 625 (Iowa 1980).

Turning to the section 598.11 criteria, the parties do not focus on Laura's age or either party's health. Instead, Robert contends the district court failed to do

equity in analyzing the parties' pecuniary conditions. He also asserts the court disregarded the pair's prenup as another pertinent matter.

### 1. What are the parties' pecuniary conditions?

Starting with finances, Robert claims the district court overlooked Laura's earning capacity. He agrees with the court that, based on her work experience, she could earn at least $50,000 per year. But he argues that she had enough time to find new employment before applying for temporary support. Robert also points out that the court ordered him to resume paying some of Laura's monthly expenses. He contends these payments allow Laura to retain more of her unemployment and rental income to cover her needs.

We disagree with Robert's contention that Laura could find solid financial footing in such a short timeframe. She needed more than two-and-a-half months to secure employment for a few reasons. First, she had to expend time and resources moving to a new state while these proceedings were pending. Second, her recent employment history is limited. Working at Sarpino's has been her only job since 2017. *Cf. In re Marriage of Pelletier*, No. 12-0090, 2012 WL 3590464, at *1 (Iowa Ct. App. Aug. 22, 2012) (denying temporary spousal support where unemployed spouse had worked several jobs in last five years with yearly salaries ranging from $65,000 to $80,000).

True, Robert has resumed paying some of her monthly expenses. But Laura incurred moving and security expenses and faced ongoing costs in maintaining the condos. So while Laura does have rental and unemployment income, she still requires support to meet her financial needs while the dissolution action is pending. The district court properly awarded Laura $1000 in temporary

support, which was half the amount she requested. S*ee* Iowa Code § 598.10(1)(a) (stating that temporary orders are for the "separate support and maintenance of the other party . . . and to enable such party to prosecute or defend the action").

Robert next argues that awarding Laura temporary support was unjust given the impact on his standard of living. He notes that his financial burden increased because he must keep paying expenses for the Florida condos despite losing their rental income. According to Robert, the order "does not merely require [him] to pay the same bills he or the business paid until the parties' separation." Instead, it "drastically increases" that burden because he "did not pay her salary or car payment" before the order as "both were paid by Laura's employer."

Problem is, Robert *was* Laura's employer before these proceedings. He owned at least 80% of Sarpino's, and now he asserts full ownership. In fact, Robert signed a letter as "owner" terminating Laura's employment. Thus, making Laura's car payment is not a new expense for Robert that would impact his pre-dissolution standard of living.

Granted, Robert can no longer rely on rental income from the Florida condos. But he retains a gross yearly salary of at least $195,000—nearly four times Laura's earning capacity. We acknowledge Robert has expenses in maintaining that business. But we are also aware of "the ability of a self-employed party to manipulate [their] earnings" in dissolution proceedings. *In re Marriage of Redenius*, No. 21-0593, 2022 WL 946206, at *2 (Iowa Ct. App. Mar. 30, 2022) (collecting cases). And as a business owner, he "is in the best position to explain his income," so "he bears the burden of showing what income should be considered and what should be excluded." *Id.* Robert provides no information on

Sarpino's net value or if he tapped the restaurant's business account for personal use. Instead, Laura lists the restaurant's value at $740,000 after encumbrances. And the record shows that, while together, he and Laura used the restaurant's account for personal expenses, such as her car payment, groceries, and gas. *Cf. In re Marriage of McKamey*, 522 N.W.2d 95, 99 (Iowa Ct. App. 1994) (finding it proper to increase a self-employed spouse's income by amounts taken from the business for personal use).

Given their income disparity and the uncertainty on Robert's personal use of Sarpino's revenue, we decline to disturb the temporary order. Robert's loss of rental income and requirement to pay Laura $1000 a month in temporary support do not compromise his ability to take part in the proceedings. *See* Iowa Code § 598.10(1)(a).[4]

### 2. Is the prenup pertinent?

Next, Robert highlights the prenup as a factor weighing against temporary spousal support. He concedes the district court acknowledged their agreement in its order. But he contends the court failed to properly weigh the prenup because the court did not mention the provisions stating that he and Laura were to maintain separate incomes and be responsible for their own debts and insurance. He claims these provisions "evince the parties' intent to maintain separate finances and property both during and after their marriage."

---

[4] Robert also brings up Laura's withdrawal of funds from their business and personal accounts as a reason to deny her spousal support. Given our sparse record, we find that issue better resolved by the district court at property division after a full record is made. *See Redenius*, 2022 WL 946206, at *3.

Laura counters, insisting that the prenup does not fall under the criteria for calculating temporary spousal support. While the court can consider such agreements in determining spousal support following a "judgment of annulment, dissolution, or separate maintenance" under Iowa Code section 598.21A(1)(i), she notes that spousal support from a temporary order is governed by a different set of statutory criteria.[5]

Robert agrees that temporary spousal support orders are governed by Iowa Code section 598.11(1). But he responds that Iowa courts have "routinely referenced" Iowa Code section 598.21A factors in assessing temporary orders. In his view, those final-decree factors fall under "other matters as are pertinent" in the temporary support analysis. *See* Iowa Code § 598.11(1)

Admittedly, our court has not been clear on whether we should borrow final-decree factors for our analysis of temporary spousal support. *Compare In re Marriage of Boysen*, No. 21-1355, 2022 WL 1100258, at *3 (Iowa Ct. App. Apr. 13, 2022) ("[T]he factors listed in [section 598.21A] apply to final judgments, not temporary ones."), *with Edwards*, 2020 WL 3564698, at *2 (using final-decree factors as criteria for temporary spousal support), *and In re Marriage of Olson*, No. 18-1860, 2019 WL 4302128, at *2 (Iowa Ct. App. Sept. 11, 2019) (same). But assuming that borrowing is permitted, the final-decree factors need to fall within section 598.11(1)'s criteria: the applicant's age, the parties' physical or pecuniary conditions, or other pertinent matters. *See In re Marriage of Cannon*, No. 21-0322,

---

[5] Laura also points out that—if the prenup may be considered—it could not preclude her from spousal support. *See* Iowa Code § 596.5(2) ("The right of a spouse or child to support shall not be adversely affected by a premarital agreement.").

2022 WL 946212, at *2 (Iowa Ct. App. Mar. 30, 2022) (considering tax consequences of temporary support when assessing parties' pecuniary conditions); *see also* Iowa Code § 598.21A(1)(g) (listing tax consequences to each party as a final-decree factor).

Based on this record, the prenup signed by Robert and Laura did not affect their pecuniary conditions at the time of the hearing on temporary matters. So we only consider the prenup if it is otherwise pertinent to Laura's need for temporary support. *See* Iowa Code § 598.11(1). Not all the factors in section 598.21A(1) are automatically pertinent to temporary spousal support. If they were, the legislature wouldn't have needed to draft section 598.11(1). "As a general rule of statutory construction, we avoid an interpretation or application of a statute that renders other portions of the statute superfluous or meaningless." *Little v. Davis*, 974 N.W.2d 70, 75 (Iowa 2022).

So how do we decide what is pertinent? In common parlance, "pertinent" means: "Of, relating to, or connected with a specific matter." *Pertinent*, *American Heritage Dictionary* (1965). From that definition, we glean that a matter is pertinent under section 598.11(1) when it relates to or is connected with the specific issues to be decided in the temporary order. While that may sound generic, we take further clues from the organization of the text. The general catchall "other matters as are pertinent" follows two specific phrases: "[T]he age of the applicant" and "the physical and pecuniary condition of the parties." Iowa Code § 598.11(1). Usually, "general words which follow specific words are tied to the meaning and purpose of the specific words." *Iowa Comprehensive Petrol. Underground Storage Tank Fund Bd. v. Shell Oil Co.*, 606 N.W.2d 376, 380 (Iowa 2000). So we decide pertinence

as a reflection of those preceding phrases. "The fancy term for this is *ejusdem generis*." *Sallee v. Stewart*, 827 N.W.2d 128, 153 (Iowa 2013).[6]

Both phrases direct the court to consider the parties' current conditions. First, the court considers the applicant's age when seeking a temporary order. Iowa Code § 598.11(1). And second, the court considers a snapshot of both parties' health and financial situations. *Id.* § 598.11(1); *see Small v. Small*, 42 Iowa 111, 111–13 (1875) (assessing parties' income, expenses, property, and debts at the time of order in determining their pecuniary conditions for temporary support). Put differently, both phrases lock the parties in the present for the court to decide temporary issues—the court does not look forward at how the final decree will turn out.

Thus for a matter to be pertinent under section 598.11(1), it must relate to or be connected with the parties' physical or financial fitness during the divorce proceedings. *See In re Est. of Sampson*, 838 N.W.2d 663, 670 (Iowa 2013) (finding statutory interpretation of a catch-all term required "reference to the other items in the list" in analyzing the term). This is so because "[w]hen the initial terms all belong to an obvious and identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012). Otherwise a "tagalong general term" could be given a broader definition and render the initial phrases superfluous or meaningless. *Id.* at 199–200; *see Little*, 974 N.W.2d at 75.

---

[6] This phrase is Latin for "of the same kind or class." *Ejusdem generis*, *Black's Law Dictionary* (7th ed. 1999).

With those interpretive aids in mind, we turn to the key question: is the prenup pertinent in deciding temporary spousal support? We decline to answer that question categorically. There may be cases in which a prenup's terms are pertinent to temporary spousal support. But this case is not one of them from our reading of the record. This prenup purports to govern "the use and disposition of property and income" during their marriage and upon separation or divorce. Because dissolution proceedings are ongoing, disposition of property hasn't yet occurred. And as for the use of income and property during their marriage, the parties' actions while together contradict the prenup. The record shows that the couple had a joint bank account and that Robert included Laura on his insurance coverage and made her car payments through the business. On top of that, Sarpino's paid some of her personal expenses, including her phone plan and gas for her car. All in all, Robert and Laura did not abide by the prenup terms during the marriage. Accordingly, it is not relevant to their financial conditions during the divorce proceedings.

This conclusion finds support in the context of the dissolution chapter. Section 598.11(1) directs the district court to "not hear any other matter relating to the petition, respondent's answer, or any pleadings connected with the petition or answer" when issuing a temporary order. This restriction reaffirms that temporary orders are based on where the parties are now, not where they will be. *See* Iowa Code § 4.1(38) (stating that "[w]ords and phrases shall be construed according to the context and the approved usage of the language"). What's more, section 598.10(1)(a) states that temporary orders are "for the separate support and maintenance of the other party . . . and to enable such party to prosecute or defend

the action." *See* Iowa Code § 4.6(1) (directing us to consider "[t]he object sought to be attained" in interpreting a statute). The express purpose behind temporary orders is to help parties affected by separation proceedings to take part in the dissolution process. *See Bork*, 289 N.W.2d at 625 (expressing "concern that parties affected by dissolution actions . . . be adequately provided for while awaiting a final decision"). This purpose matches our common-law rule expressing "a preference for protecting the financially dependent spouse's unpredictable need for support and ability to leave a broken marriage over the parties' general right to contract." *In re Marriage of Erpelding*, 917 N.W.2d 235, 241 (Iowa 2018). This is especially true here, where the court is considering the parties' current financial means and the validity of the prenup on a more limited record than what will be available upon a full dissolution hearing.

To recap, the prenup entered by Robert and Laura did not bear on their pecuniary positions before the final property distribution. In other words, it was not pertinent to the temporary matters being decided. The district court properly declined to factor in the prenup in awarding temporary spousal support. That award achieved equity in accordance with the statute's text and purpose.

**B. Appellate Attorney Fees**

Finally, Laura requests appellate attorney fees to defend the temporary order. Such an award is not a matter of right but rests in our discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). "We consider the needs of the party making the request, the ability of the other party to pay, and whether the party was required to defend the district court's decision on appeal." *Id.* Considering the parties' relative financial conditions and Laura's success on

appeal, we agree that Robert should pay her appellate attorney fees.  We remand for the district court to determine a reasonable award.

**AFFIRMED AND REMANDED.**